IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHRISTOPHER R. SILVA,** : | |
| Plaintiff, : | |
| : | Civil Action No. 1:04-CV-2018 |
| v. : | |
| : | (Chief Judge Kane) |
| : | |
| **MARYLAND SCREEN PRINTERS,** : | |
| **INC.,** : | |
| Defendant. : | |

## MEMORANDUM

Pending before this Court are cross-motions for summary judgment. (Doc. Nos. 47, 54.) The motions are fully briefed and ripe for disposition. The Court heard arguments on August 29, 2006. For reasons that follow, Defendant's motion for summary judgment will be granted and Plaintiff's motion will be denied as moot.

**I.    BACKGROUND**

This case arose out of an employment dispute between Plaintiff Christopher Silva and his former employer, Defendant, Maryland Screen Printers, Inc. ("MSP"). Silva is a Pennsylvania citizen. MSP is a Maryland corporation engaged in the business of producing and selling custom-printed t-shirts and active wear. MSP is owned by Garrett Pfeifer ("Pfeifer"), and his brother, Craig Pfeifer.

The following facts are not in dispute. At some point during 1997, MSP sought to diversify and expand its business by adding account representatives to handle corporate and custom t-shirt printing orders. MSP hired Silva to be MSP's first account representative. Before Silva began as a sales person, Pfeifer met with Silva and represented to him that Silva's compensation would be based on commissions calculated by the profit made on each of Silva's sales. This arrangement was intended to avoid diminishing profit margins. Pfeifer spoke only in

general terms at the meeting and did not discuss specific commission terms.

On November 16, 1997, Pfeifer wrote a letter to Silva ("November Letter") that described a general formula for calculating Silva's commissions.[1] The formula provided that Silva would receive a commission equal to one-half of the "net margin" for each sale. The letter also expressly stated that the formula should be "fine-tuned" before Silva started work. No further writings followed the November Letter, and Silva began working in late 1997. He worked primarily in Baltimore, Maryland, but he occasionally worked from his home in Pennsylvania.

Over the course of Silva's employment, Silva prepared itemized estimates of his commissions. These commissions were paid after MSP's accountant completed a reconciliation of Silva's calculations. Apparently, the accountant reconciled Silva's calculation by subtotaling the net revenues for each sale within a given time-frame, and then reducing the subtotal by a list of expenses under a heading that she called "Deductions." In these reconciliations, MSP deducted various costs including: (1) costs associated with samples and United States Tennis Association ("USTA") catalogs; (2) costs associated with custom artwork; (3) costs associated with royalties paid to the USTA; (4) uncollected shipping and freight charges; and (5) value-labeling charges. These deductions, according to Silva, reduced his commission by almost $185,000. Silva disputed these deductions as unauthorized. Soon the dispute escalated to a point of serious contention between Silva and Pfeifer. At one point, Silva's wife phoned Pfeifer

---

[1] The formula was as follows: <u>Net Selling Price</u> (Price less discounts, COD charges, freight out, uncollectible amounts) – <u>Cost of Garment or Item</u> (including freight in) – <u>MSP Contract Printing or Embroidery Cost</u> – <u>Direct Expenses Reimbursed to Salesman</u> = <u>Net Margin</u> to be split equally by Salesman and MSP. (Doc. No. 55, at ¶ 10.)

to inform him that the wage dispute was having an impact on Silva's family financial obligations, particularly because his wife was recovering from cancer.  Nonetheless, Silva continued working for MSP after each of these disputes.

Also relevant to this action is that during the course of his employment, Silva brought the "USTA" to MSP as a customer.  By 1999, USTA was MSP's largest customer.  In late 1999, Silva prebooked gray t-shirts for use in certain USTA programs.  Due to unexpected events, USTA dropped much of the order, and MSP was left with a substantial number of USTA labeled T-shirts.  MSP contends that the corporation incurred costs as a result of this overstock.  The parties disagree as to who is responsible for these losses.

On September 11, 2003, Silva was fired from MSP for insubordination.  On September 13, 2004, Silva filed this action against MSP in this Court alleging breach of contract and violations of the Maryland Wage Payment and Collection Law, Md. Code Ann. Lab. & Empl. §§ 3-501 et seq.  (Doc. No. 1.)[2]  On October 13, 2004, MSP moved to dismiss the complaint, claiming that this Court lacked personal jurisdiction over Defendant and that venue was improper.  (Doc. No. 3.)  By order entered on September 15, 2005, this Court denied the motion to dismiss.  (Doc. No. 25.)  In its answer, filed on October 13, 2005, MSP asserted a counterclaim for recoupment for losses allegedly incurred as part of the USTA deal.  (Doc. No. 29.)  Silva subsequently filed a motion for summary judgment on June 26, 2006.  (Doc. No. 47.) MSP filed a cross-motion for summary judgment on the same date. (Doc. No. 54.)

---

[2] This Court has subject matter jurisdiction to hear these claims pursuant to 28 U.S.C. § 1332.

## II.     STANDARD OF REVIEW

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When no genuine dispute exists, summary judgment should be granted where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When seeking summary judgment, the moving party has the burden of "informing the district court of the basis for its motion." Id. at 323. This burden is met when the moving party can demonstrate an "absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof.'" UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004) (internal citations omitted).

Although the parties do not agree about whether Maryland or Pennsylvania substantive law should govern issues related to the applicable statutes of limitation and the pleading requirements, the parties do agree that Maryland law governs the breach-of-contract and Maryland Wage Payment & Collection Law claims. Because the Court will only reach these claims, the Court will not address these choice-of-law questions.[3]

---

[3] In the ordinary course, the Court would first address issues of statutes of limitation and pleading requirements. Here, however, the Court declines to address these issues, because they ultimately depend on the application of Pennsylvania state choice-of-law rules and, in any event, would not be dispositive in this case. Additionally, because both parties agree that Maryland law governs the Plaintiff's claims, and summary judgment is appropriate on those claims, the timeliness of the defenses will be a moot issue.

4

**III.   DISCUSSION**

    **A.   A valid employment contract existed between Silva and MSP.**

Defendant first argues that the November Letter containing the general formula for calculating Silva's commission did not create an enforceable employment contract between Silva and MSP. Specifically, Defendant claims that language in the November Letter expressing the need to "fine-tune" the formula proves that the parties did not agree upon a comprehensive means of calculating Silva's commission, and therefore no meeting of the minds ever took place. (Doc. No. 51, 12.) This argument fails.

While the record is clear that the parties did not agree at the time of contracting as to the precise meaning of "net margin," this does not prove that no contract existed. For a contract to be enforceable in Maryland, court must be able to "determine the intention of the parties." Geo. Bert. Cropper, Inc. v. Wisterco Invest., Inc., 399 A.2d 585, 594-95 (Md. 1979). Although the November Letter does not define the precise parameters for computing Silva's commission, the Court is able to determine that the parties intended to pay Silva a commission equal to half of the "net margin." The Court therefore finds that a contract existed, and the November Letter is evidence of the terms of that contract.

    **B.   Mr. Silva did not acquiesce to "modified terms of his commission structure."**

Defendant also argues that even if a contract existed, Plaintiff is not entitled to relief under Maryland law, because an at-will employee who chooses to work after terms of employment have changed acquiesces to the new terms of employment. In support of this argument, Defendant cites to a number of cases all holding that at-will employees implicitly accepted the employer's terms by continuing to work after the new terms were defined. See

Castiglione v. Johns Hopkins Hosp., 517 A.2d 786, 790 n.4 (Md. Ct. Spec. App. 1987); Staggs v. Blue Cross of Md., Inc., 486 A.2d 798, 802 (Md. Ct. Spec. App. 1985); Williams v. Jacksonville Terminal Co., 315 U.S. 386 (1942); Bodie v. City of Columbia, 934 F.2d 561, 568 (4th Cir. 1991); Rousseau v. Teledyne Movible Offshore, Inc., 805 F.2d 1245 (5th Cir. 1986).

In each of these cases, however, the modified terms of employment were always clear to the employee. In Castiglione and Staggs, for example the employee implicitly acquiesced to new terms in an employee manual and policy statements. 517 A.2d at 790 n.4, 486 A.2d at 802. Similarly in Bodie (worker's sleep time was not compensated), Williams ("redcaps" received wages below the minimum wage due to receipt of tips), and Rousseau (no-leave rule), the courts found that the employees implicitly accepted new terms or rules that were otherwise clearly demarcated. Without notice of the modified terms, it is impossible for an at-will employee to accept them.

In the instant case, Silva could not have agreed, implicitly or explicitly, to a change in the terms of the contract because no discrete terms were ever modified. Instead, this was a dispute over the interpretation of an already existing employment contract. For example, had Pfeifer told Silva that MSP would stop compensating Silva on a commission basis, MSP could argue that the contract was modified. By contrast, in this case, Silva continued working with the expectation that he would receive a commission based upon "net margin." Silva was not compensated accordingly, and MSP cannot argue that it modified the contract ex post.

C.  **Silva waived his breach of contract claims**.

Although MSP had a contractual obligation to pay Silva a commission based upon a "net margin," Silva waived MSP's non-performance. It is settled under Maryland law that "a party to

6

a contract may waive any provisions made for his benefit." Bargale Indus., Inc. v. Robert Realty Co., 343 A.2d 529, 533 (Md. 1975) (quoting Twining v. Nat'l Mortgage Corp., 302 A.2d 604, 607 (Md. 1973)).  Such waiver of non-performance can be express or implied from a party's conduct.  Myers v. Kayhoe, 892 A.2d 520, 530-31 (Md. 2006); Canaras v. Lift Truck Services, Inc., 322 A.2d 866, 878-80 (Md. 1974).  Although waiver is ordinarily an issue of fact, Bargale Indus., 343 A.2d at 533, continued performance under a contract after a material breach occurred indicates a waiver.  Accord Barnes v. St. Albans Psychiatric Hosp., Inc., 1991 U.S. App. LEXIS 23520, at *6 (4th Cir. Oct. 8, 1991) ("Because the employer can terminate an at-will employee at any time, it follows that the employer can, simply on notice, also unilaterally reduce the salary of an at-will employee.").

In the employment context, the Maryland Court of Appeals in National School Studios, Inc. v. Mealey, held that "one may waive the breach of the contract and later be bound by his election" by continuing to work after a party has breached.  126 A.2d 588, 596 (Md. 1956).  As a matter of law, therefore, an at-will employee who opts to continue working after a known breach occurs waives any claims under the contract.  Id. ("The law will not permit one who has made such an election and accepted its benefits to wait until he leaves the employer's service and then claim that he was not bound by his own conduct.")

As an at-will employee, Silva waived his claims by continuing to work for MSP.  Silva was aware of MSP's conduct, but continued to provide services long after the "deductions" were taken. (Doc. No. 61, at ¶ 32.)  Therefore under Maryland contract law, Silva's election to continue on as an employee of MSP excused Defendant's non-performance under the employment contract.

### D. Plaintiff is not entitled to any additional compensation under the Maryland Wage Payment Collection Law.

In his complaint Silva also claims that he is entitled to back wages under the Maryland Wage Payment Collection Law ("MWPCL", or the "Act"). The MWPCL provides for treble damages and attorneys' fees where an employer violates certain practices. Battaglia v. Clinical Perfusionists, Inc., 658 A.2d 680, 681 (Md. 1995). One such violation is "an employer's failure to pay commissions earned during employment yet not payable until resignation." Medex v. McCabe, 811 A.2d 297, 302 (Md. 2002). The Act, however, does not create a right to recover all back wages. It merely imposes on employers a "duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment." Friolo v. Frankel, 819 A.2d 354, 362 (Md. 2003) (emphasis added); see also Stevenson v. Branch Banking & Trust Corp., 861 A.2d 735, 749 (Md. Ct. Spec. App. 2003).

Silva claims that under the MWPCL he is entitled to recover the "deductions" that MSP took from his commissions. The MWPCL does permit recovery of unpaid commissions, but limits recovery to those commissions that were not payed as a result of the employee's termination. Admiral Mortgage, Inc. v. Cooper, 745 A.2d 1026, 1029 (Md. 1999). Thus, in Admiral Mortgage, the Maryland Court of Appeals found that a terminated employee could recover unpaid commissions earned during his employment but were not payable at the time of his termination. 745 A.2d at 1028 ("When Cooper quit his employment in August, 1995, there were pending eleven outstanding loan applications that he had developed but which had not yet closed.") In contrast, commissions already paid are not recoverable under the MWPCL.

Importantly, the MWPCL does not create additional rights for the employee, it only defines the remedy by which a wronged employee may seek relief. In Battaglia, the Maryland

Court of Appeals held that "nothing in §§ 3-502 or 3-505 of the Act alters the common law analysis." 658 A.2d at 685. Thus, Silva's claims are governed by Maryland common law principles, which allows for recovery of back wages "either by claiming the value of the work performed (quantum meruit), or by including the back wages as part of a claim for breach of the express contract." Id. at 683. Here, however, Silva did not bring a quantum meruit claim, and as explained above he waived his breach-of-contract claim by continuing to work for MSP.

      **E.    Defendant's defensive recoupment counterclaims are inapplicable because the Plaintiff's claims will be dismissed.**

In its answer, MSP asserted a recoupment counterclaim arising out of costs associated with the ill-fated USTA transaction. Although the parties disagree as to which test ought to be used in deciding whether such a counterclaim may proceed, there is no disagreement that Defendant does not seek affirmative relief in this case. Rather, MSP seeks only an abatement of damages from Silva's claims. Because Silva's complaint will be dismissed, MSP is therefore not entitled to recover on its recoupment claim.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment will be granted and Plaintiff's motion for summary judgment will be denied as moot. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHRISTOPHER R. SILVA,** : | |
|     Plaintiff, : | |
| : | Civil Action No. 1:04-CV-2018 |
| v. : | |
| : | (Chief Judge Kane) |
| : | |
| **MARYLAND SCREEN PRINTERS, INC.,** : | |
|     Defendant. : | |

**ORDER**

Based upon the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is **GRANTED**. The Clerk of Court is directed to close the case. **IT IS** FURTHER ORDERED that Plaintiff's motion for summary judgment is **DISMISSED** as moot.

                                                          s/ Yvette Kane
                                                          Yvette Kane, Chief Judge
                                                          United States District Court
                                                          Middle District of Pennsylvania

Dated: October 26, 2006